**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

HOWARD D.,[1]

                     Plaintiff,             5:19-cv-01615 (BKS)

v.

ANDREW M. SAUL, Commissioner of Social Security,

                     Defendant.

**Appearances:**

*For Plaintiff:*
Craig Polhemus
Avard Law
P.O. Box 101110
Cape Coral, FL 33910

*For Defendant:*
Antoinette T. Bacon
Acting United States Attorney
Luis Pere
Special Assistant United States Attorney
Social Security Administration
15 New Sudbury St., Room 625
Boston, MA 02203

**Hon. Brenda K. Sannes, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff Howard D. filed this action under 42 U.S.C. § 405(g) seeking review of a

decision by the Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for Social Security Disability Insurance ("SSDI") Benefits. (Dkt. No. 1). The parties'

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect his privacy.

briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 9, 10). After carefully reviewing the Administrative Record,[2] (Dkt. No. 6), and considering the parties' arguments, the Court reverses the Commissioner's decision and remands this matter for further proceedings.

## II.   BACKGROUND

### A.   Procedural History

Plaintiff applied for SSDI benefits on November 20, 2017, alleging disability due to post-traumatic stress disorder ("PTSD"), insomnia, anxiety, depression, high blood pressure, diabetes, leg impairments, and an enlarged prostate. (R. 299). Plaintiff alleged a disability onset date of November 15, 2012, (R. 268), through his date last insured of March 31, 2015, (R. 88). The Commissioner denied Plaintiff's claim on February 20, 2018. (R. 143-46). Plaintiff appealed that determination, and hearings were held before Administrative Law Judge ("ALJ") Jennifer Smith on July 26, 2018 and March 5, 2019, at which Plaintiff was represented by counsel. (R. 58-84, 85-130). On March 13, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 39-55). Plaintiff filed a request for review of that decision with the Appeals Council, which denied review on June 28, 2019. (R. 8-13). Plaintiff filed a second request for review with the Appeals Council to consider new medical evidence; the Appeals Council set aside its earlier action to consider the additional information, but, after doing so, it again denied review on November 1, 2019. (R. 1-7). Plaintiff commenced this action on December 26, 2019. (Dkt. No. 1).

---

[2] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 9), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

**B.      Plaintiff's Background and Testimony**

Plaintiff was 62 years old at the time of the July 26, 2018 hearing. (R. 98). He completed

high school, (*id*.), and attended "a training school for medical assistant[s] and certified nursing

assistant[s]." (R. 72). Plaintiff served in the military from 1979 through 1981. (R. 110). Plaintiff

has worked in security, as a certified nursing assistant, and a porter (R. 98-99).

While in the military, Plaintiff experienced military sexual trauma; he suffers from "a lot

of anxiety issues" that stem from his time in the military. (R. 109). Plaintiff began receiving

treatment at the Veterans Health Administration's ("VA's") Behavioral Health Center in 2011

for psychological problems, including PTSD, anxiety, depression, and insomnia, as well as drug

and alcohol abuse, and has been treated there since. (R. 113-14). Plaintiff stated that he tried to

commit suicide between 2012 and 2015 through an overdose of "pills" and alcohol but could not

pinpoint the date. (R. 115). In 2014, Plaintiff had suicidal ideations while visiting a relative in

Florida. (R. 105). Plaintiff testified that his drug and alcohol abuse ended in 2016. (R. 111).

As to his symptoms, during the relevant time period—2012 through 2015—Plaintiff was

"having nightmares," "suicidal thoughts," panic attacks that made him feel like he was having a

heart attack, and difficulty with his memory. (R. 61-62, 68, 111). Plaintiff experiences anxiety on

a daily basis. (R. 64). Plaintiff's panic attacks were triggered by the "period of deaths" he

experienced. (R. 61).

At the time of the hearing, Plaintiff was taking Xanax, which he had been taking since

2012, and Ambien, for sleep. (*Id*.). Plaintiff was also taking metformin for diabetes, atorvastatin

for cholesterol, lisinopril for hypertension, and a "heart pill" because he bruised muscles while

lifting weights. (R. 116-17).

Regarding activities, Plaintiff stated that he "periodically" volunteered at the VA from

2012 to 2015, where he helped with patient field trips, and played cards and Bingo with patients.

(R. 103). Plaintiff stated that in 2018, he was going to the gym three times a week and lifting anywhere from 40 to 100-pound free weights. (R. 117-18). At one point, he hurt himself "lift[ing] up to 100 pounds" and had to be hospitalized. (R. 117-18).

### C.   Mental Health Evidence[3]

#### 1.   Peter Sung, M.D.

Plaintiff treated with psychiatrist Dr. Peter Sung at the VA Medical Center of Syracuse for medication management on December 12, 2012. (R. 1250). Plaintiff's noted diagnosis was "major depressive disorder, recurrent, without psychotic features." (*Id.*). Dr. Sung continued Plaintiff on Ambien and Vistaril for anxiety. (*Id.*). Plaintiff saw Dr. Sung approximately fourteen times between December 12, 2012 and May 12, 2014. (R. 1167-69, 1230, 1232, 1234, 1235-36, 1238-39, 1241, 1244-47, 1249). During that time period, Plaintiff complained of anxiety, difficulty sleeping, depression, suicidal thoughts, panic attacks, and hopelessness. (*See, e.g.*, R. 1169, 1232, 1235, 1241, 1244). Dr. Sung prescribed alprazolam and amitriptyline and increased the dosages over time to address Plaintiff's "breakthrough panic symptoms" and "intermittent trouble sleeping." (R. 1169, 1234, 1236).

#### 2.   Carlos Finlay, Ph.D.

Plaintiff saw Dr. Finlay, a psychologist at the Syracuse VA Medical Center, for psychotherapy approximately fourteen times between December 13, 2012 and January 17, 2014, at which point Plaintiff discontinued therapy because Dr. Finlay was transferring to a different facility.[4] (R. 1170, 1219-20, 1221-22, 1223-26, 1228-29). During this time period, Plaintiff presented with complaints of "recurrent episodes of depressed mood, anxiety, inconsistent

---

[3] The record contains medical records from after Plaintiff's date last insured of March 31, 2015. In light of Plaintiff's date last insured, records outside of the year of 2015 have been excluded.

[4] It appears Plaintiff had been seeing Dr. Finlay for therapy for some time, as Dr. Finlay's notes indicate that their December 13, 2012 meeting was their "21st meeting." (R. 1230).

appetite, and insomnia." (R. 1225, 1229). Plaintiff complained of nightmares, suicidal and homicidal ideation.[5] (R. 1171, 1227-28). Plaintiff also acknowledged having intrusive and recurrent memories of past military sexual assault, past suicide attempts, anhedonia, and feelings of worthlessness, (*id.*), and spoke with Dr. Finlay about anxiety he was experiencing while working at the VA hospital. (R. 1171, 1211, 1220, 1222-23). Plaintiff's diagnoses were listed as "major depressive disorder, recurrent, moderate," PTSD, insomnia, "alcohol dependence, in remission," and anemia, hypertension, and obesity. (*Id.*).

### 3.   James A. Haley Veterans' Hospital

On July 28, 2014, Plaintiff went to the emergency department of the James A. Hanley Veterans' Hospital while visiting his uncle in Tampa, Florida because he was having "suicidal thoughts and worsening anxiety for the past few months." (R. 1035). Plaintiff reported that he had "thought of harming [himself] by walking into traffic." (*Id.*). Plaintiff underwent a psychiatric evaluation, which noted that Plaintiff was "reporting [suicidal ideation] in [the] context of medication non-compliance and psychosocial stressors." (R. 1023-24). Plaintiff reported a "plan to walk in front of [a] bus and fear[ed] without admission that he would either relapse on drugs/alcohol or attempt suicide." (R. 1024). Plaintiff "request[ed] voluntary admission for crisis stabilization." (*Id.*).

Plaintiff described "sleep disturbances including initiation and sustaining adequate sleep, poor appetite, difficulty concentrating, anxiety and panic attacks, thoughts racing (without other symptoms of common of mania), and hopelessness, and suicidal ideations with plan." (*Id.*).

---

[5] On October 21, 2013, Plaintiff reported "experiencing increased anxiety triggered by two workplace incidents wherein he reported experiencing elevated discomfort due to sexual connotation," as well as experiencing a "family altercation." (R. 1170-71). Plaintiff experienced "suicidal and homicidal thoughts" the night prior, but spoke with a National Crisis Hotline operator until calm. (*Id.*). Plaintiff expressed a desire to quit his current work, but agreed to take it more slowly and continue attending work shifts. (*Id.*).

Although Plaintiff "denie[d] symptoms of psychosis," it was noted that he appeared "somewhat paranoid" and that the "content of his concerns [could not] be verified at [that] time," raising concerns "for possible delusional constructs." (*Id*.). Plaintiff requested inpatient psychiatric care. (*Id*.). Plaintiff was assessed as having an overall "moderate" risk of suicide. (R. 1028-29). Notes indicate that "involuntary hospitalization under [the] Baker Act[6] was considered, but the patient did not meet the criteria as he was requesting admission." (R. 1031). Plaintiff's primary diagnoses were "anxiety, depression," and suicidal ideation. (R. 1021). Plaintiff was discharged from the emergency department on July 28, 2014, and transferred via ambulance to North Tampa Behavioral Health ("NTBH"). (*Id*.).

### 4.     North Tampa Behavioral Health

Plaintiff was admitted to NTBH on July 28, 2014, for panic attacks. (R. 426). On July 29, 2014, a conference call was held with Plaintiff's case manager at NTBH where the case manager reported that Plaintiff had been diagnosed with major depressive disorder with psychosis, panic disorder, and a history of PTSD. (R. 1017). He received inpatient care until his discharge on July 31, 2014. (R. 426). His discharge diagnoses were major depressive disorder, PTSD, and "unspecified other substance related" disorder. (*Id*.). Plaintiff was released on July 31, 2014; Plaintiff's discharge plan included going to his uncle's home, and following up with the Syracuse VA Hospital. (R. 426).

### 5.     Prashant Kaul, M.D.

On September 3, 2014, Plaintiff had his first appointment with psychiatrist Dr. Prashant at the Syracuse VA Medical Center. (R. 1104). Dr. Kaul noted that Plaintiff had a history of

---

[6] *See* Fl. Stat. § 394.467 (Allowing involuntary admission to a treatment facility when a person with a mental illness has "refused voluntary inpatient placement" or "is unable to determine for himself [] whether placement is necessary").

"depression and anxiety," and that Plaintiff's prior psychiatrist, Dr. Sung, had left the facility.[7] (R. 1104-05). Plaintiff saw Dr. Kaul approximately five times between September 3, 2014, and May 29, 2015, (R. 1096, 1098, 1100, 1102-04). Dr. Kaul diagnosed Plaintiff with major depressive disorder "recurrent, in full remission," and anxiety disorder not otherwise specific. (R. 1106). During that time period, Plaintiff reported feeling anxious due to his living arrangements and suffering panic attacks, which Dr. Saul noted "seem[ed] to be disabling for the patient," but denied suicidal ideation, "acute issues," or drug use, and reported "full compliance with treatment." (R. 1098, 1100, 1103, 1105). Plaintiff also reported that he found that "breathing, meditation and relaxation techniques" helped to "abort[] the panic attacks," (R. 1096), and Dr. Kaul observed in May 2015, that "his anxiety [was] much better, with far fewer panic attacks." (R. 1096). Dr. Kaul monitored Plaintiff's medication over that time period, discontinuing Clonidine, (R.1104) and increasing Sertraline, (R. 1100).

### 6.    Other Mental Health Treatment at Syracuse VA Medical Center

#### a.    PTSD Treatment

During an intake interview at the Syracuse VA "PCT Clinic" on December 16, 2014, for evaluation "of PTSD symptoms and treatments recommendations for trauma focused therapy to address" military sexual trauma, Plaintiff reported "transient suicidal ideation" and "ongoing anxiety and panic symptoms," and requested individual therapy. (R. 1266-68). Plaintiff "scored a

---

[7] On June 20, 2014, Plaintiff treated with psychiatrist Tolani Ajagbe, M.D., at the Syracuse VA Medical Center. (R. 1163). The reason for Plaintiff's visit was that he needed "to talk to someone about a recent event leading to a panic attack." (R. 1164.). Plaintiff reported an "increased level of anxiety," and that his "depressive and anxiety symptoms" had been "well controlled until recently when he started having problems with the management" of his apartment building. (*Id.*). Plaintiff admitted to having "recurrent panic attacks, which [had] been fairly well controlled until recent events." (*Id.*). Dr. Ajagbe noted Plaintiff's diagnoses as "major depressive disorder, recurrent, without psychotic features," and "anxiety disorder nos." (R. 1165). His plan for Plaintiff was to continue his current medication, return for an appointment with Dr. Kaul for medication management, and to speak to someone in social services about his living situation. (*Id.*).

48 on the PCL endorsing intrusive, negative mood/cognitions, and arousal symptoms on relation" to his military sexual trauma. (*Id*.). He scored a "10 on the PHQ-9 suggesting moderate levels of depression." (*Id*.). He requested "that he be connected with an individual therapist," and was "open to addressing his MST." (*Id*.). Plaintiff was diagnosed with PTSD secondary to military sexual trauma, major depressive disorder, recurrent, moderate, "cocaine dependence, early remission," "alcohol dependence, early remission," and "r/o panic disorder." (R. 1268).

On December 29, 2014, Plaintiff called Syracuse VA Social Worker and "PTSD Clinical Team Leader" Shawne Steiger reporting a "very high" level of anxiety and sought help "figuring out what to do as he didn't want to go inpatient in Syracuse." (R. 1192). On December 31, 2014, Plaintiff met with Steiger for therapy for the first time. (R. 1218). Plaintiff complained that his medications were "making it difficult for him to wake up or function," and he "did slur his words and had some difficulty staying on topic during the session," although "it was difficult to tell whether this was sedation or anxiety." (R. 1219). Plaintiff denied suicidal or homicidal ideation, and was "somewhat tangential and appeared anxious with some psychomotor agitation." (*Id*.). Plaintiff met with Steiger on January 7, 2015 and reported being anxious. (R. 1218). On February 25, 2015, Plaintiff met with Steiger for therapy. (R. 1216). Plaintiff was "alert and oriented," but "appeared somewhat anxious." (*Id*.). He reported that his mood was "somewhat sad, related to the loss of some friends over the past week." (*Id*.). Steiger noted that Plaintiff's session was "primarily supportive in nature," as he did "not appear ready to engage in intensive PTSD treatment." (R. 1217). Steigler developed a treatment plan for Plaintiff on February 26, 2015 to address his PTSD related to military sexual trauma. (R. 1255). The plan included helping Plaintiff develop "improved distress tolerance, motion regulation, interpersonal and mindfulness

skills," and achieving a "stable home life" while "maintain[ing] functioning with no relapse to substance use, hospitalizations or increase in anxiety." (R. 1256).[8]

  **b.**  **Calls to the VA National Suicide Prevention Hotline**

  On July 27, 2014, Plaintiff called the VA National Suicide Prevention Hotline because he was having suicidal thoughts as well as sleep and homelessness issues. (R. 1262). On August 10, 2014, Plaintiff called the VA National Suicide Prevention Hotline, (R. 1181), regarding "[m]ental heath/illness" and "PTSD Symptoms," in connection with his living situation and need for new housing. (R. 1182). On October 3, 2014, Plaintiff called the VA National Suicide Prevention Hotline, reporting "Economic Problems" and "Homelessness Issues." (R. 1258). On March 16, 2015, Plaintiff called the VA National Suicide Prevention Hotline regarding his "mental health/illness" because two of his "veteran friends died recently." (R. 1178-79). In a follow-up call from a VA Suicide Prevention Coordinator on March 18, 2015, to Plaintiff indicated that he had lost three friends "over a one month span," and discussed "his difficulty with coping with tremendous losses over such a short time" (R. 1177). He reported suicidal ideations "given his current life stressors but denie[d] any plan or intent to act on these thoughts." (*Id.*).

  **D.**  **Physical Health Evidence**

  **1.**  **Diabetes and Podiatry Treatment**

  On March 4, 2013, Plaintiff had a diabetes consult with registered nurse, Gail Serino, at the Syracuse VA Medical Center following a Type 2 Diabetes diagnosis in February 2013. (R. 540-41). Plaintiff underwent podiatry footcare for "intermittent tingling of feet" on October 4, 2013. (R. 538). On May 18, 2015, during a consultation with "orthotics prosthetics," for

---

[8] Plaintiff also attended PTSD group therapy during this time period—attending approximately five times from January 6, 2015 through March 17, 2015. (R. 1186-91).

"diabetic shoes." (R. 522). Plaintiff was noted as having a diagnosis of "diabetes w/neuropathy." (*Id.*). Plaintiff reported that he "used to have neuropathy symptoms to his feet but it has reduced now," allowing him to "do a lot of walking." (*Id.*). On July 20, 2015, Plaintiff requested a new ankle brace to address a history of "ankle sprain" and "ankle instability." (R. 519-20). Plaintiff stated he walks "10 miles a day" and requested a pair of New Balance sneakers. (R. 520). On September 10, 2015, Plaintiff had an "orthotics prosthetics consult," where his diagnosis was noted as "ankle pain." (R. 518). Plaintiff's range of motion and muscle strength were within normal limits. (R. 519). He was fitted with an ankle brace and New Balance sneakers. (*Id.*).

### 2. Cardiology Consults

On November 21, 2013 and against on March 26, 2014, Plaintiff underwent cardiology consults for chest pain. (R. 427, 528, 536).

### 3. Dr. Spiro Tzetsiz, M.D.

On October 30, 2015, Plaintiff treated with Dr. Spiro Tzetzis at the Syracuse VA Medical Center for a follow up "of his medical problems," and denied "any complaints." (R. 1116).[9] Dr. Tzetizis noted that Plaintiff was "walking regularly," had "no joint stiffness or muscle aches," and "positive psychiatry." (R. 1117). He also noted that Plaintiff had gained "a significant amount of weight," and Plaintiff indicated he was planning on increasing his exercise level. (R. 1118). Plaintiff's hypertension was "borderline," and the determination was made to "work on weight loss and exercise." (*Id.*).

---

[9] The only reference to Dr. Tzetzis during the relevant time period is in a section of Plaintiff's VA Medical Center of Syracuse records listing his "Problems/Conditions," where Dr. Tzetzis is listed on a single entry as a "provider." (R. 436). He did not enter the note, and it is unclear if he saw Plaintiff in person or provided any treatment.

When Plaintiff treated with Dr. Tzetizis on December 15, 2015, where Plaintiff reported that his sister "passed away on Thanksgiving day at the age of 61 of cardiac arrest," and that he was "handling the situation well." (R. 1138).

### E.    Opinion Evidence

#### 1.    Spiro Tzetzis, M.D.

##### a.    2018 Medical Source Statement

On May 23, 2018, Dr. Tzetzis submitted a medical source statement regarding Plaintiff's ability to perform work-related functions.[10] (R. 809-811). Under "frequency and length of contact," Dr. Tzetzis indicated he saw the Plaintiff "[illegible] 6 mos." (R. 809). He diagnosed Plaintiff with PTSD, anxiety, depression and insomnia, and listed his prognosis as "guarded." (*Id*.). He noted that Plaintiff was "incapable of even 'low stress' jobs." (*Id*.). Physically, Dr. Tzetzis noted Plaintiff could walk 2.5 city blocks without rest or severe pain, could sit for 20 minutes at one time, and stand for 15 minutes at one time. (*Id*.). In an 8-hour work day, he felt that Plaintiff could sit for "about 2 hours," "stand/walk" for "about 2 hours," and would require a job that permitted him to shift positions at will from sitting, standing, or walking. (*Id*.). Although Plaintiff would not need to elevate his legs, he indicated that Plaintiff would need a "cane or other assistive device" to stand or walk. (R. 810). Dr. Tzetzis noted that Plaintiff would need to take unscheduled breaks two to three times per week, for approximately an hour during the workday. (R. 810). He also opined that while Plaintiff could "occasionally" carry less than 10 pounds, he could "never" carry greater weight than that. (*Id*.). He did feel that Plaintiff could "occasionally" look down, turn his head right or left, look up, and hold his head in a "static

---

[10] Dr. Tzetzis provided a second medical source statement, dated July 8, 2019, months after the ALJ rendered her decision and therefore was never considered by her. (R. 30-33). It was considered by the Appeals Council in Plaintiff's second appeal. (R. 2).

position." (*Id.*). He further noted that Plaintiff could "rarely" twist, stoop, crouch, squat, or climb

ladders, and could "occasionally" climb stairs. (*Id.*). He opined that Plaintiff could

"occasionally" grasp, turn, or twist objects with his hands and use his fingers for "fine

manipulations," but only "rarely" reach with his arms. (R. 810-11).

He opined that Plaintiff's impairments were "likely to produce 'good days' and 'bad

days,'" and that Plaintiff would have, on average, "more than four days per months" where he

would be absent from work. (R. 811). Dr. Tzetzis noted that Plaintiff's lower back pain, bilateral

knee pain, and bilateral foot pain would also affect Plaintiff's ability to work at a regular job on a

sustained basis. (*Id.*). Dr. Tzetzis did not indicate the time period to which the medical source

statement applied, however a note in Plaintiff's medical records shows that on May 23, 2018, he

called Plaintiff "and discussed questions [on the disability questionnaire] with his current

abilities." (R. 1126).

**b.    2019 Medical Source Statement**

Dr. Tzetzis submitted a second medical source statement, dated July 8, 2019, in which he

indicated Plaintiff's conditions had existed since February 1, 2010. (R. 33). In it, Dr. Tzetzis

opined that Plaintiff's "right knee osteoarthritis, left arm pain, and low back pain" limited him to

an exertional limitation of lifting less than 10 pounds "occasionally." (R. 31). He opined that

Plaintiff's "right knee osteoarthritis" and "low back pain" limited him to only being able to

"stand and/or walk" for "less than 2 hours in an 8 hour workday," and sit for "less than 2 hours

in an 8 hour workday." (*Id.*). He opined that Plaintiff would need to "alternate between sitting

and standing to relieve pain and discomfort." (*Id.*). He also felt that Plaintiff would be unable to

bend, kneel, crouch, or crawl, and would be restricted to climbing, balancing, or stooping for

"less than 1/3 of the workday" due to his "right knee osteoarthritis" and "low back pain." (*Id.*).

Due to pain in both of Plaintiff's upper extremities, Dr. Tzetzis opined that Plaintiff could only

reach or engage in fine and gross manipulation for "less than 1/3 of the workday." (*Id.*). He opined that Plaintiff must take a break ever "20 minutes" for medical reason, and that each break must last for "15 minutes" due to Plaintiff's osteoarthritis. (*Id.*). He further opined that Plaintiff need to elevate his legs above his heart and required a "cane or other assistive device to ambulate." (R. 33).

Dr. Tzetzis noted that Plaintiff had "major depressive disorder, panic disorder, [and] insomnia," and "gets panic attack[s] with pain." (*Id.*). He opined that Plaintiff was limited to performing the following tasks for "less than 1/3 of the workday": concentrating; following, carrying out, remembering, and understanding simple instructions; using judgment; responding to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. (*Id.*). He expected Plaintiff to be off task "more than 60%" of the time, and to miss "3 days/month" of work due to either doctor's appointments or medical impairments. (*Id.*).

### 2.  Kalyani Ganesh, M.D.

Dr. Ganesh performed an internal medicine examination on Plaintiff on June 21, 2018. (R. 1146). Plaintiff reported that he has "pain in the right knee and right ankle," and that it is "a constant aching pain," that has "more to do with prolonged walking, walking fast, and doing stairs." (*Id.*). Plaintiff presented with a cane, which he purchased for himself the month before. (*Id.*). He was given injections for pain in the right knee and right ankle, and wears a brace for the right ankle. (*Id.*). Plaintiff "appeared to be in no acute distress," with a normal gait and stance. (R. 1147). Plaintiff cannot "walk on heels and toes," "cannot squat," and used a cane that did not "appear necessary." (*Id.*). Plaintiff did not need help getting on and off the exam table, and was able to "rise from [the] chair without difficulty." (*Id.*). Plaintiff had full range of motion in his knee and ankles bilaterally, with "no redness, heat, swelling, or effusion." (R. 1148). Dr. Ganesh diagnosed Plaintiff with right knee and right ankle pain. (R. 1149). He opined that his prognosis

was "fair" and that he had no limitations on sitting and standing, and "mild limitation" on "walking and climbing." (*Id*.).

### 3. Corey Anne Grassl, Psy.D.

Consultant examiner Dr. Grassl submitted a psychiatric evaluation for Plaintiff. (R. 1151). Dr. Grassl noted that Plaintiff "drove himself three miles to the evaluation." (*Id*.). Dr. Grassl noted that Plaintiff's "sleep is normal with Ambien," and that his appetite is normal. (*Id*.). She noted a worsening of Plaintiff's "depressive symptomatology" after the passing of Plaintiff's sister in 2015, and that current symptoms include "sad moods, crying spells, guilty, irritability, and social withdrawal." (*Id*.). Plaintiff said he had been experiencing "excessive worry, restlessness, and muscle tension," but no suicidal or homicidal ideation, plan, or intent. (*Id*.). Plaintiff denied experiencing panic attacks, but did experience "exposure to trauma, flashbacks, hyperstartle responses, nightmares, hypervigilance, intrusive thoughts, detachments from others, and anger outbursts." (*Id*.). Plaintiff experienced "short-term memory deficits and concentration difficulties" but no manic symptomatology or symptoms of "formal thought disorder." Plaintiff denied currently using drugs or alcohol, but admitted to a history of "cocaine and alcohol abuse from 1980 to 2011." (R. 1151-52).

Dr. Grassl opined that Plaintiff had:

> No evidence of limitation in his ability to understand, remember, and apply simple directions and instructions; understand, remember, and apply complex directions and instructions; use reason and judgment to make work-related decisions; maintain personal hygiene and appropriate attire; and be aware of normal hazards and take appropriate precautions. He is moderately limited in his ability to interact adequately with supervisors, coworkers, and the public and regulate emotions, control behavior, and maintain well-being. Markedly limited in his ability to sustain concentration and perform a task at a consistent pace and sustain an ordinary routine and regular attendance at work. Difficulties are caused by psychiatric problems.

(*Id.*). She diagnosed Plaintiff with persistent depressive disorder, generalized anxiety disorder, PTSD, alcohol use disorder in sustained remission, and narcotics use disorder in sustained remission. (R. 1154). Dr. Grassl recommended that Plaintiff continue with his current treatment, and expected the "duration of impairment and time frame for suggested therapy" to be more than one year. (*Id.*). She noted Plaintiff's prognosis as "fair, given engaged in treatment." (*Id.*).

### 4.    Mary Eileen Buban, Psy.D.

#### a.    November 2012 through September 2014

Dr. Buban completed a medical source statement covering the time period from November 15, 2012, "through approximately September 2014," which included any limitations related to Plaintiff's substance abuse. (R. 1331). Dr. Buban did not examine Plaintiff, but reviewed Plaintiff's medical records from 2011 through 2018. (R. 1323-30). Dr. Buban opined that Plaintiff did not have any limitations in understanding and remembering simple instructions, carrying out simple instructions, or his ability to make judgments on simple work-related decisions. (R. 1319). She opined that Plaintiff was "moderate[ly]" limited in understanding and remembering complex instructions, carrying out complex instructions, making judgments on complex work-related decisions, and in his ability to interact appropriately with supervisors and co-workers and to respond appropriately to usual work situations and changes in a routine work setting. (*Id.*). She opined that Plaintiff had moderate to marked limitations in his ability to interact appropriately with the public. (*Id.*). She felt that "due to symptoms during this period," Plaintiff would "do best with simple repetitive tasks in a low stress, non-public setting" involving "occasional contact [with] supervisors and coworkers." (R. 1334, 1336).

#### b.    September 2014 Onward

Dr. Buban completed a second medical source statement opining on Plaintiff's functionality after September 2014, post-substance abuse treatment, and assuming his "sobriety."

(R. 1311). Excluding any limitations imposed by substance abuse, Dr. Buban opined that

Plaintiff had no limitations with respect to understanding, remembering, and carrying out simple

instructions, or in his ability to make judgments on simple work-related decisions. (R. 1299). She

opined that Plaintiff had "mild" limitations understanding, remembering, and carrying out

complex instructions, and "moderate" limitations in his ability to make judgments on complex

work-related decisions. (*Id*.). She opined that Plaintiff was moderately limited in his ability to

interact appropriately with the public and respond appropriately to usual work situations and to

changes in a routine work setting, but only mildly limited in his ability to interact appropriately

with supervisors and co-workers. (R. 1300). She further opined that he was capable of "simple,

detailed and previously learned complex tasks," interacting "with others," and would "do best in

a non-customer service position." (R. 1314, 1316).

### 5. Michael Traurig, M.D.

Dr. Traurig completed a medical source statement regarding Plaintiff's physical

impairments. Dr. Traurig did not meet with Plaintiff but reviewed his medical records. (R. 1360).

Dr. Traurig opined that Plaintiff could "continuously" lift up to 10 pounds, "frequently" lift 11 to

50 pounds, and "occasionally" lift 51 to 100 pounds. (R. 1354). He opined that Plaintiff could

"continuously" carry up to 10 pounds, "frequently" carry 11 to 50 pounds, and "occasionally"

carry 51 to 100 pounds. (*Id*.). He cited Plaintiff's "chronic knee [and] ankle pain" in support of

this finding. (*Id*.). In total during the workday, he opined that Plaintiff could sit and stand for

eight hours, and walk for at least five hours.[11] (*Id*.). He opined that Plaintiff could "continuously"

reach, handle, finger, feel, push and pull with both hands. (R. 1356). He opined that Plaintiff

could "frequently" operate foot controls with his right foot, and "continuously" operate foot

---

[11] Dr. Traurig indicated that Plaintiff could walk for both five and eight hours total in the work day. (R. 1355).

controls with his left foot. (R. 1356). He opined that Plaintiff could "continuously" climb stairs

and ramps, occasionally climb ladders or scaffolds, and frequently balance, stoop, kneel, crouch,

or crawl. (R. 1357). He opined that Plaintiff could tolerate exposure "occasionally" to

unprotected heights, "frequently" to moving mechanical parts, motor vehicle operation, humidity

and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold and heat, and vibrations.

(R. 1358). He opined that Plaintiff could be exposed to "loud (heavy traffic)" noise. (*Id.*).

### 6.    Vocational Expert – Robert Baker[12]

Vocational expert Robert Baker testified at the March 5, 2019 hearing before the ALJ.

The ALJ posed a hypothetical:

> So the claimant should not be required to lift more than 50 pounds.
> The claimant can frequently lift up to 25 pounds. The claimant can
> sit for eight hours in an eight-hour day. [] The claimant can stand for
> eight hours in an eight-hour day. The claimant can walk for five
> hours in an eight-hour day. Claimant can frequently operate . . . foot
> controls with his right foot. The claimant should not climb ladders,
> ropes, scaffolds. Claimant can frequently balance, stoop, kneel,
> crouch, and crawl. Claimant has no limitations with respect to ramps
> and stairs. The claimant should not work at unprotected heights,
> climb ladders, ropes or scaffolds, or work in close proximity to
> dangerous machinery and moving mechanical parts of equipment.
> Claimant can have frequent exposure to respiratory irritants such as
> dust, odors, fumes gases, and extreme hot and cold temperatures,
> and vibrations. The claimant should work in a noise environment of
> loud or below. The claimant should work at simple, routine,
> repetitive tasks. The claimant should work in a low-stress job,
> defined as occasional decision making, occasional judgment
> required, and occasional changes in the work setting. The claimant
> should work at goal-oriented work rather than production pace rate
> work. The claimant should have occasional contact with co-workers,
> supervisors, and the public.

---

[12] Vocational expert LaShun Alexander testified at the March 5, 2019 hearing, but as the ALJ only relied on Baker, the Court need not recount Alexander's testimony here.

(R. 76). The ALJ also posed an alternative hypothetical that was identical to the first except that the hypothetical individual should have "no public contact." (R.79-80). Baker testified that a hypothetical individual with such restrictions would not be able to perform any of Plaintiff's past work. (R. 76-77). Baker testified the individual in either hypothetical could work as a "kitchen helper," "cook helper," and "bartender helper," all of which have an "SVP of 2" and required medium exertion. (R. 77-78). Baker testified that the "maximum allowed time off task is 15 percent," and that "anything greater would rule out all employment." (*Id*.). He also testified that "frequent problems with persistence and pace" would rule out all employment, as would "frequent issues with contact with others," including supervisors and co-workers, as opposed to just the public. (R. 81-82).

## F.   The ALJ's Opinion Denying Benefits

The ALJ issued a decision dated March 13, 2019, and determined that Plaintiff was not disabled under the Social Security Act. (R. 42-50). After finding, as an initial matter, that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2015, (R. 44), the ALJ used the required five-step evaluation process to reach his conclusion.[13]

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity between his alleged onset date of November 15, 2012, through his date last insured

---

[13] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

("DLI") of March 31, 2015 ("the relevant time period"). (*Id.*). At step two, the ALJ determined that Plaintiff had the following severe impairments under 20 C.F.R. §§ 404.1520(c): "knee and ankle impairments, diabetes with neuropathy, obesity, anxiety disorder, panic disorder, posttraumatic stress disorder, depressive disorder, and a history of substance abuse." (*Id.*). The ALJ noted that the "record also references diagnoses of plantar fascial fibromatosis, hypertension, and hyperlipidemia," but that that "these are not severe impairments." (R. 44-45).[14]

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 45 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526)).[15]

The ALJ proceeded to determine Plaintiff's residual functional capacity ("RFC")[16] and found that Plaintiff had the RFC "to perform less than the full range of medium work[17] as defined in 20 CFR 404.1567(c)." (R. 46). Additionally,

> [h]e should not be required be required to lift more than 50 pounds.
> He can frequently lift up to 25 pounds. He can sit for eight hours in
> an eight-hour day. He can stand for eight hours in an eight-hour day.
> He can walk for five hours in an eight-hour day. He can frequently
> operate foot controls with his right foot. He should not climb
> ladders, ropes, or scaffolds. He can frequently balance, stoop,

---

[14] Plaintiff does not challenge the ALJ's finding at step 2 that these conditions were nonsevere.

[15] Plaintiff does not challenge the ALJ's finding at step 3 that his impairments do not meet or medically equal the severity of a listed impairment.

[16] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*.

[17] 20 C.F.R. § 404.1567(c) provides:

> Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of
> objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she
> can also do sedentary and light work.

> crouch, kneel, and crawl. He has no limitations with respect to climbing ramps and stairs. He should not work at unprotected heights or in close proximity to dangerous machinery or moving mechanical parts of equipment. He can have frequent exposure to respiratory irritants such as dust, odors, fumes, gases, extreme cold temperatures, and vibrations. He should work in a noisy environment of loud or below. He should work at simply, routine, repetitive tasks. He should work in a low stress job, defined as one requiring only occasional decision-making and judgment with only occasional changes in the work setting. He should work at goal oriented work rather than production pace rate work. He should have occasional contact with coworkers and supervisors and no public contact.

(*Id*.). Applying this two-step process, the ALJ found that while the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," the "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 47). The ALJ further explained that "the objective evidence of record fails to support the level of severity alleged by the claimant." (*Id*.). Addressing Plaintiff's diabetes, the ALJ noted that Plaintiff "ha[d] changed his diet and learned to manage his anxiety, which has been able to drop his A1c from 9.8 to 5.7," resulting in relief from "his neuropathy symptoms." (*Id*.).

The ALJ also addressed Plaintiff's "psychiatric symptoms related to the death of his parents during his childhood and a past incident of military sexual trauma," and noted that "claimant's exacerbated psychiatric symptoms are often caused by expected reactions to situational factors." (*Id*.).

After considering the opinion evidence of record, the ALJ gave "some weight" to the opinion of "impartial medical expert Michael Traurig, M.D.," who opined on Plaintiff's physical limitations, explaining that Dr. Traurig rendered it "after a thorough review of the entirety of the evidence relevant to the period in question," and that it was "generally consistent with the

claimant's high level of physical activity during this time, including his admitted walking up to 10 miles per day." (R. 48). The ALJ gave "little weight" to the opinion of Dr. Tzetzis, one of Plaintiff's physicians, because it was rendered in 2018, "several years after the expiration of the date last insured and therefore is not relevant to the period in question." (*Id.*). The ALJ also noted that that it was rendered "after only six months of treatment." (*Id.*). Similarly, the ALJ gave little weight to the opinion of the consultative examiner Dr. Ganesh because he "examined the claimant once in 2018 and is not able to render an opinion on the claimant's functional abilities during the period in question, which ended in March 2015." (*Id.*).

For Plaintiff's mental limitations, the ALJ gave "some weight" to two opinions submitted by "impartial medical expert Mary Buban, Psy.D." because "it was rendered after a thorough review of the entirety of the evidence relevant to the period in question by an impartial physician with extensive program and professional expertise." (*Id.*). She gave "little weight" to the opinion of "consultative examiner Corey Anne Grassl, Psy.D." because it was "rendered after a one-time examination of the claimant that took place more than three years after the expiration of the date last insured and therefore is not relevant to the period in question." (*Id.*).

At step four, having determined Plaintiff's RFC and relying on the testimony of the vocational expert, the ALJ determined that while Plaintiff was incapable of performing his past relevant work, there "were jobs that existed in significant number in the national economy that the claimant could have performed." (R. 49).

Thus, the ALJ concluded that Plaintiff had "not been under a disability, as defined in the Social Security Act, at any time from November 15, 2012, the alleged onset date, through March 31, 2015, the date last insured." (R. 50 (citing 20 C.F.R. § 404.1520(g)).

### III. DISCUSSION

#### A. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'" *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). The Court reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987).

#### B. Analysis

Plaintiff argues that: (1) the ALJ failed to properly weigh Dr. Tzetzis's opinions; (2) the ALJ improperly found Plaintiff capable of performing medium work in an effort to "circumvent

the grids"; (3) the jobs the ALJ relied on in finding that Plaintiff was not disabled are not compatible with Plaintiff's RFC; and (4) the ALJ erred by not giving any weight to Plaintiff's "100% impairment rating" from the Department of Veterans Affairs. (Dkt. No. 9, at 15-24).

### 1.    Dr. Tzetzis's Opinions

Plaintiff argues that the ALJ erred in weighing both Dr. Tsetzis's May 23, 2018 opinion, (R. 809-11 ("2018 Opinion")) and his July 8, 2019 opinion, (R 31-33 ("2019 Opinion")). (Dkt. No. 9, at 15-16). Defendant disagrees, and asserts the ALJ properly found the 2018 Opinion, issued two years after the disability period, was not retroactive, and that Plaintiff waived any argument with respect to the 2019 Opinion by not challenging the Appeals Council's decision. (Dkt. No. 10, at 4).

For claims filed after March 27, 2017, regulations regarding the evaluation of medical evidence have been amended and several of the prior Social Security Rulings have been rescinded. *See* 20 C.F.R. §§ 404.1527, 416.927 (noting applicability only to "claims filed before March 27, 2017"). In accordance with the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules")*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider ALJ medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c). The ALJ is still required to "articulate how [she] considered the medical opinions" and "how persuasive [she] find[s] all of the medical opinions." *Id*. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," and an

ALJ is required to "explain how [she] considered the supportability and consistency factors" for a medical opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).

With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2). An ALJ must consider, but is not required to discuss, the three remaining factors when determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).

Because Plaintiff filed his application for benefits on November 20, 2017, (R. 299), his claim is governed by the new regulations.[18]

### a.    2018 Opinion

Plaintiff argues that the ALJ "neglected to use the regulatorily required factors for weighing [] medical opinions" when evaluating the opinion of Dr. Tzetzis. (Dkt. No. 9, at 19). Defendant argues that because Dr. Tzetzis's opinion "does not apply to the relevant period, plaintiff cannot rely on it to establish actionable error." (Dkt. No. 10, at 6).

---

[18] Plaintiff assumes the new regulations apply, (Dkt. No. 9, at 19 (citing 20 C.F.R. § 404.1520c as the applicable regulation)), and Defendant does not contest this (Dkt. No. 10, at 6).

The ALJ "gave little weight to the [2018 Opinion] of Spiro Tzetzis, M.D., as this opinion was rendered in 2018 after only six months of treatment. This is several years after the expiration of the date last insured and therefore is not relevant to the period in question." (R. 48). As an initial matter, Defendant concedes the first reason the ALJ gave for rejecting the opinion "does not survive scrutiny," because Dr. Tzetzis had seen Plaintiff for longer than six months when he rendered the opinion.[19] (Dkt. No. 10, at 4-5). The Court therefore turns to whether the ALJ's rejection of Dr. Tzetzis's 2018 Opinion because it was rendered "several years after the expiration of the date last insured" is sufficient explanation under the new regulations. *See* 20 C.F.R. § 404.1520c.

The new regulations require that an ALJ "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision." 20 C.F.R. § 404.1520c(b)(2). Because of the newness of the regulations, there is a dearth of caselaw interpreting these provisions, but, in general, courts have remanded where an ALJ did not adhere to the regulations. *See Raymond M. v. Comm'r of Soc. Sec.*, No. 05-cv-1313, 2021 WL 706645, at *8, 2021 U.S. Dist. LEXIS 32884, at *24 (N.D.N.Y. Feb. 22, 2021) ("The ALJ provided no substantive explanation for her conclusion that Dr. Ferrin's opinion was persuasive, making only general reference to the state agency consultant's expertise and experience, and his review of the available record . . . This omission alone would likely warrant remand."); *Cuevas v. Comm'r of Soc. Sec.*, No. 20-cv-0502, 2021 WL 363682, at *16, 2021 U.S. Dist. LEXIS 19212, at *52 (S.D.N.Y. Jan. 29, 2021) ("Given the newness of the regulations, the ALJ's failure to develop the record in significant

---

[19] This confusion likely stems from his medical source statement, where, when asked about his "frequency and length of contact" with Plaintiff, Dr. Tzetzis wrote "[illegible] 6 mos." (R. 809).

areas . . . and the ALJ's failure to properly apply the new regulations replacing the treating

physicians rules, this Court will not engage in a substantial evidence review to determine if the

legal errors were harmless."); *Andrew G. v. Comm'r of Soc. Sec*. No. 19-cv-0942, 2020 WL

5848776, at *7, 2020 U.S. Dist. LEXIS 182212, at *19 (N.D.N.Y. Oct. 1, 2020) (remanding

where the ALJ "failed to follow the regulatory requirement that she adequately explain the

supportability or consistency factors that led her to conclude that" treating physician's

retrospective check-box form was unpersuasive).

Few cases have addressed how these regulations apply to a retrospective medical source

statement, but one court has found that "the retrospective nature of the opinion cannot alone

support the ALJ's decision" under the new regulations. *See Abramson v. Comm'r of Ssa*, No. 19-

cv-00362, 2020 WL 7022260, at *7, 2020 U.S. Dist. LEXIS 222747, at *22 (D. Ariz. Nov. 30,

2020) ("[T]he Court agrees [] that the ALJ erred in giving reduced weight to the opinion of Dr.

Avina on the grounds that she had not examined Plaintiff until October 2018 . . . Here, the ALJ

did not provide any other legally sufficient reasons for rejecting Dr. Avina's opinion, and the

retrospective nature of the opinion cannot alone support the ALJ's decision.").

Unlike the opinion at issue in *Abramson*, which clearly stated the retrospective time

period to which it applied, Dr. Tzetzis's 2018 Opinion is silent as to whether it reflected his

current functionality, or was retrospective. *See Vitale v. Apfel*, 49 F. Supp. 2d 137, 142

(E.D.N.Y. 1999) ("While the existence of a pre-existing disability can be proven by a

retrospective opinion, such an opinion must refer clearly to the relevant period of disability and

not simply express an opinion as to the claimant's current status."). Dr. Tzetzis filled out a

medical source statement detailing Plaintiff's diagnoses, prognosis, and limitations, (R. 809-

811), but Plaintiff's medical records indicate that the 2018 Opinion was based on Plaintiff's "current abilities" as of May 23, 2018, and was not, in fact, retrospective, (R. 1126).

However, the ALJ did not "explain how [she] considered the supportability and consistency factors" as she was required to under C.F.R. § 404.1520c(b)(2). The ALJ rendered a two-sentence explanation as to why she gave "little weight" to the 2018 Opinion, based partly on a reason that was factually incorrect (Dr. Tzetzis having only treated Plaintiff for six months). The ALJ was aware of, and stated she considered, "the medical opinion(s) . . . in accordance with the requirements of 20 CFR 404.1520c." (R. 46). And yet, the ALJ assigned different weights to all the medical opinions, in contravention of the regulations, *see* 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."), but, more importantly, did not address the required factors of supportability and consistency for Dr. Tzetzis's 2018 Opinion. *See Warren I. v. (ATB) Comm'r of Soc Sec.*, No. 20-cv-495, 2021 WL 860506, at *6, 2021 U.S. Dist. LEXIS 42246, at *17 (N.D.N.Y. Mar. 8, 2021) ("Absent any specific guidance from the Second Circuit to the contrary, this court does not go so far to find that an ALJ's assignment of evidentiary weight to a medical opinion in a claim filed after March 27, 2017, by itself, renders the decision legally insufficient. However, the court is less inclined to excuse an ALJ's failure to discuss the persuasiveness of a medical opinion in any specific detail, per 20 C.F.R. §§ 404.1520c(a)-(c) and 416.920c(a)-(c).").[20]

---

[20] Defendant argues that Plaintiff cannot rely on an opinion that "does not apply to the relevant period" "to establish actionable error." (Dkt. No. 10, at 6). In support, Defendant cites to *Flanigan v. Colvin*, where the court noted that the ALJ "properly decided not to give" a medical opinion weight "since it only referenced a period outside the relevant period." 21 F. Supp. 3d 285, 303-04 (S.D.N.Y. 2014) (internal quotations omitted). Notably in *Flanigan*, the court relied on well-established precedent regarding the "treating physician rule" to determine the ALJ's rejection of the medical opinion at issue was not in error. *Id*. at 304-05. The "treating physician rule," is found in one of the rescinded regulations, 20 C.F.R. § 404.1527, and does not govern this case. Instead, the ALJ was required to adhere to 20 C.F.R. § 1520(c), and explain how she "considered the supportability and consistency factors."

b.      **2019 Opinion**

Dr. Tzeitzis also filled out a second medical source statement that specifically stated Plaintiff's conditions existed during the relevant time period—from 2010 onward. (R. 33). However, this opinion was dated July 8, 2019, several months *after* the ALJ rendered her decision, and thus the ALJ could not have considered it. Plaintiff submitted Dr. Tzeitzis's 2019 Opinion to the Appeals Council, which considered it but found that the "evidence [did] not show a reasonable probability that it would change the outcome of the decision" and denied review. (R. 1-2). Plaintiff argues that the Court should consider the 2019 Opinion. (Dkt. No. 9, at 19). Defendant responds that because Plaintiff has not challenged the Appeals Council's decision to deny review, Plaintiff has waived any arguments with respect to the 2019 Opinion, (Dkt. No. 10, at 5-6).

"[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996)). Where the "Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision," and therefore "our review focuses on the ALJ's decision." *Lesterhuis*, 805 F.3d at 87 (citing 42 U.S.C. § 405(g)). In reviewing the ALJ's decision, "[w]e 'review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary.'" *Id*. (quoting *Perez*, 77 F.3d at 46). Because neither the Appeals Council nor the ALJ applied the regulations to either of Dr. Tzeitzis's opinions, on the facts of this case, the ALJ's decision was not supported by substantial evidence. *See Lesterhuis*, 805 F.3d at 89 (finding the ALJ's decision was "not supported by

substantial evidence" where "[n]either the ALJ nor the Appeals Council analyzed the substance of" the medical opinion submitted to the Appeals Council).

Significantly, at least one aspect of Dr. Tzeitzis's opinion would be dispositive as to disability: he indicated that Plaintiff would be off task "more than 60%" of the time, explaining that Plaintiff "gets panic attack with pain." (R. 33). At the March 5, 2019 hearing, vocational expert Robert Baker testified that the "maximum allowed time off task is 15 percent" and "anything greater would rule out all employment." (R. 80). The only medical source statement considered by the ALJ with respect to Plaintiff's mental impairments, that of Dr. Buban, did not give an opinion as to the amount of time Plaintiff would spend off task, and the parties identify nothing in the record that contradicts Dr. Tzeitzis's conclusion on this issue. Although the Appeals Council denied review on the basis that Dr. Tzeitzis's 2019 Opinion would not change the outcome of the decision, the Appeals Council's decision only reflects an acknowledgement of the evidence and denial of review, and does not reflect that the Appeals Council analyzed the opinion under the new regulations. *See Seifried ex rel. A.A.B. v. Comm'r of Soc. Sec.*, No. 13-cv-0347, 2014 U.S. Dist. LEXIS 138571, at *8 (N.D.N.Y. July 30, 2014) ("It is insufficient for the Appeals Council to merely acknowledge that they reviewed new evidence from a treating physician without providing such reasoning." (citing *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009))), *report and recommendation adopted*, 2014 WL 4828191, 2014 U.S. Dist. LEXIS 137010, (N.D.N.Y. Sept. 29, 2014); *see also Kurten v. Comm'r of Soc. Sec.*, No. 18-cv-0174, 2019 WL 4643606, at *3, 2019 U.S. Dist. LEXIS 163379, at *7 (W.D.N.Y. Sept. 24, 2019) ("[W]hen [a plaintiff] submit[s] to the Appeals Council []physician opinions on the nature and severity of their impairments during the relevant period of disability . . . 'the Appeals Council must give good reasons for the weight accorded to' that opinion." (quoting *Djuzo v.*

*Colvin*, No. 13-cv-272, 2014 U.S. Dist. LEXIS 158832, at *9 (N.D.N.Y. Oct. 3, 2014), *report and recommendation adopted*, 2014 WL 5823104, 2014 U.S. Dist. LEXIS 157608 (N.D.N.Y. Nov. 7, 2014))). Based on the entirety of the record and in light of the lack of analysis of Dr. Tzetzis's opinions under the applicable regulations, the Court cannot say that substantial evidence supported the ALJ's decision and the matter must be remanded for further proceedings.

### 2.    Remaining Arguments

Because the neither of Dr. Tzetzis's opinions were evaluated in accordance with the regulations, remand is required and the Court does not reach Plaintiff's remaining arguments.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED**; and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated:  March 26, 2021
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge